Pennsylvania Turnpike Commission *v.* Evans, Appellant.

Argued January 6, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO and JONES, JJ.

*Frederick G. McGavin*, with him *Earl V. Compton* and *Compton, Handler & Berman*, for appellant.

*Harold E. Kohn*, with him *Aaron M. Fine* and *Dilworth, Paxson, Kalish, Kohn & Dilks*, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 17, 1958:

Manu-Mine Research and Development Company has appealed from the grant of a preliminary injunction by the Court of Common Pleas of Dauphin County, at the instance of the Pennsylvania Turnpike Com-

mission, restraining the transfer by it of its bank account, or any part thereof, and the disposition of any assets and funds coming into its possession.

On March 6, 1957 the Pennsylvania Turnpike Commission (herein called Commission) instituted an equity action against Thomas J. Evans, former Commission Chairman, Manu-Mine Research and Development Company (herein called Manu-Mine) and its officers, directors and stockholders. In this action the Commission sought: (1) to enjoin Manu-Mine, its directors, officers and stockholders, from disposing of Manu-Mine's assets and funds—to either themselves or others—until final determination of the Commission's claim; (2) to require certain of the individual defendants (the Sticklers, Landsidle and Dalpra) to repay to Manu-Mine all bonuses, salaries and other payments received by them from Manu-Mine since 1951 and to have them declared trustees ex maleficio of all such sums; (3) to have a receiver appointed; (4) to enjoin all the defendants from destroying or disposing of their records and (5) a judgment in the Commission's favor and against Manu-Mine, Evans, the Sticklers and Landsidle in the amount of $11,329,141.59.

The complaint itself—charging a fraudulent conspiracy between Evans as Commission Chairman and the other defendants,—alleges that the Commission was defrauded of large sums of money in connection with a so-called "Tunnel Contract" and a mine flushing contract in connection with the northeast extension of the Pennsylvania Turnpike.

The Commission alleges that, even though Manu-Mine and its personnel were totally inexperienced, Manu-Mine proposed to the Commission that it perform certain experimental and maintenance work for the prevention of water leakage in certain Turnpike tunnels and that such proposal, due to Evans' influ-

ence, was accepted by the Commission; that Manu-Mine engaged an Illinois concern to perform the work and for this work—performed without Manu-Mine's participation or supervision—from April 1952 to November 1952 Manu-Mine received $151,500 of which its share was approximately fifty per cent. The Commission further alleges that Manu-Mine, through Charles Stickler and Dalpra, copied the processes, plans and equipment of the Illinois concern without its permission and, in September 1952, Manu-Mine proposed to the Commission that it conduct a survey of winter conditions within and around certain Turnpike tunnels; this proposal, through Evans' influence, was accepted and from November 1952 to April 1953 Manu-Mine received for this study $26,433. The Commission further alleges that, upon completion of this study, Manu-Mine proposed to the Commission that it be engaged to perform during a three-month period certain experimental, maintenance and construction work on certain Turnpike tunnels, representing to the Commission that such work was necessary, that it would result in a correction of the water leakage and that the prices proposed to be charged were fair and reasonable; by reason of Evans' influence, a contract was entered into in April 1953 between the Commission and Manu-Mine, which contract the Commission alleges was unlawfully and illegally entered into; Manu-Mine represented to the Commission that the program which it was pursuing under the contract created a layer of solid fill in the void spaces of the tunnels and that by the use of certain chemicals it prevented the tunnel joints and cracks from leaking, all of which the Commission alleges was untrue. Pursuant to this contract and during the years 1953, 1954 and 1955, Manu-Mine was paid by the Commission $1,651,554.26, together with $69,887.33 for additional work.

The Commission further alleges that in October 1953 Manu-Mine, by its president, proposed to the Commission that it be engaged to make a study for the purpose of recommending to the Commission the best possible route for the northeast extension of the Turnpike; this proposal, accepted by the Commission, carried with it a fee of $12,000 and the route finally selected by the Commission, based upon Manu-Mine's recommendation, traversed areas in which there had been extensive anthracite coal mining. In July 1954, Manu-Mine, by its president, proposed that it be engaged by the Commission to undertake a three-month study to determine what method, if any, was necessary to achieve adequate surface support for this section of the Turnpike, and for the preparation of this proposal Manu-Mine was paid $12,350. The original three-month study was extended from time to time over a period of sixteen months and Manu-Mine was paid $104,712.60 for experimental drillings and $284,600 for the study itself. In December 1954, Manu-Mine, by its president and general manager, submitted to the Commission an analysis of the cost of air blast drilling which it had recommended as the most feasible method of protecting the surface of the Turnpike extension. The Commission alleges that, even though Manu-Mine knew that the daily rate of drilling was far in excess of 25 feet per day and that a profit of $14 per foot would be in excess of ten per cent, it represented to the Commission that the average rate of drilling per day was 25 feet and that its profit at the price of $14 per foot would be only ten per cent. In January 1955, Manu-Mine, by its president and general manager, submitted to the Commission another analysis of the cost of air blast drilling. The Commission alleges that, even though Manu-Mine knew that the average rate of drilling per day was in excess of 28 feet and that

its profit at $12.50 per foot would be far in excess of ten per cent, it represented to the Commission that the average rate of drilling per day was 28 feet and at its price of $12.50 per foot its profit would be only ten per cent.

The Commission further alleges that Manu-Mine, by its president and general manager, falsely and fraudulently advised the Commission that the route of the northeast extension of the Turnpike presented unique problems of adequate surface support and that a vast program of drilling for the purpose of flushing sand into the voids created by the coal mining under the route was necessary, whereas, such a program was unnecessary and the method of flushing was useless in achieving the needed surface support. The Commission further alleges that Manu-Mine made false representations to the Commission of the cost of drilling and the cost of the program and, on the basis of such representations and by reason of Evans' influence, the Commission on February 28, 1955 entered into an agreement with Manu-Mine for carrying out such a program. It is alleged that this contract was an unlawful and illegal contract. Under this contract Manu-Mine was paid $6,724,718.74. The Commission further alleges that Manu-Mine falsely represented to the Commission the amount of drilling which it had performed and that, by such false representations, instead of having been paid $6,724,718.74 Manu-Mine should have received, if anything at all, no more than $5,890,-397.91. The Commission further alleges that Manu-Mine conspired with a certain Rogers Construction Company to misrepresent to the Commission the number of cubic yards of material flushed into the holes drilled by Manu-Mine. Finally, the Commission alleges that as a result of the fraudulent conspiracy and false misrepresentations the Commission paid Manu-

Mine approximately $7,000,000 for work which was totally unnecessary, improperly performed and which resulted in an unconscionable profit to Manu-Mine.

On April 3, 1957 preliminary objections to this complaint were filed on behalf of the defendants, Manu-Mine, the Sticklers, McGavin and Dalpra.

During the pendency of this litigation, on August 7, 1957, the Commission applied to the Court of Common Pleas of Dauphin County for the appointment of a receiver pendente lite for Manu-Mine for the purpose of preserving and protecting its assets. To this application for the appointment of a receiver, Manu-Mine filed an answer. On this petition and answer a hearing was held before Judges NEELY, ROYAL and RICHARDS.

On September 20, 1957, after hearing, the learned court below refused the Commission's application for a receiver pendente lite but did grant a preliminary injunction. This injunction enjoined Manu-Mine "from transferring the sum of $15,000, or any portion thereof, now deposited to its account in the Berks County Trust Company . . . from drawing against that account or disposing of the same in any manner; . . . from disposing of any assets and funds that shall come into its hands, representing the equity of [Manu-Mine] after the payment and satisfaction of [certain liens and claims referred to in the Court's Opinion]." From the grant of this preliminary injunction this appeal was taken.

On an appeal from a decree issuing a preliminary injunction, we look only to see "if there were any apparently reasonable grounds for the action of the court below" and "we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong

or clearly inapplicable:" *Williams v. Bridy,* 391 Pa. 1, 136 A. 2d 832; *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343, 344, 123 A. 2d 626; *Riverside Borough School District v. International Brotherhood of Electrical Workers, Local No. 607,* 389 Pa. 637, 133 A. 2d 554; *Motor Transport Labor Relations, Inc. v. Team Drivers Local No. 470,* 389 Pa. 638, 133 A. 2d 836.

After an examination of the Commissioner's complaint and the testimony taken at the preliminary hearing we are fully satisfied that the learned Court below had reasonable grounds upon which to grant this injunction. The record sufficiently and adequately indicates such a shrinkage in Manu-Mine's assets and funds in such a comparatively short time that the court was fully justified in enjoining, for the purpose of preservation, any further transfer or disposition of Manu-Mine's assets. There is nothing of record to indicate that the court below acted arbitrarily or unreasonably under the circumstances and the record fully justified its action.

Decree affirmed. Costs on appellants.

Mr. Justice COHEN took no part in the consideration or decision of this case.